("OFFICER JOHN DOE 2"), state to a female officer whose name, shield and command he later learned to be OFFICER GOMEZ, who at that time was assigned to the Patrol Borough of Manhattan North Task Force, say, "This is your arrest."

44. OFFICER GOMEZ is listed as the arresting officer on all applicable paperwork in this matter.

45. When OFFICER GOMEZ was pointed out to Mr. Dunlop, he observed OFFICER GOMEZ watching a group of individuals already under arrest, nowhere in the vicinity of the place Mr. Dunlop was actually placed under arrest.

46. Mr. Dunlop was then taken in flexi cuffs to a police vehicle and placed inside in excess of one and a half hours in the heat without water. The entire time the windows and doors remained closed and there was no air flow inside. Mr. Dunlop began to sweat profusely and he began to feel feverish and clammy.

47. While waiting for other arrestees to be placed in the police vehicle, the flexi cuffs began to cut into his skin. Mr. Dunlop then asked the NYPD driver, ("OFFICER JOHN DOE 3") to loosen his flexi cuffs. Upon information and belief, OFFICER JOHN DOE 3 instead tightened the cuffs even more, causing more pain, discomfort, and visible lacerations to both wrists.

48. Upon information and belief, OFFICER JOHN DOE 3 stated that he had tightened the cuffs "Because you might try to attack me." As a result of the actions of OFFICER JOHN DOE 3, Mr. Dunlop's wrists began to bleed and swell.

49. Upon information and belief, during the RNC, Defendants including but not limited to the CITY OF NEW YORK, BLOOMBERG, KELLY, ESPOSITO, GRAHAM and COLGAN, implemented a policy, practice or custom of detaining those arrested on

August 27, 2004 in the vicinity of the RNC protest, without justification, for an unnecessary and prolonged period of time in unhealthy and dangerous conditions. In particular, Defendants implemented arrest procedures which were intended to and did in fact unreasonably prolong and extend the period of time that Mr. Dunlop was held in custody following his unlawful arrest. These included, *inter alia*, the use of Pier 57 as an intermediate holding facility fingerprinting of all those arrested, including Mr. Dunlop who was charged with minor offenses for which fingerprinting is unnecessary, and was implemented so as to unnecessarily and unreasonably extend and prolong the period of time that Mr. Dunlop was held in custody.

50. Upon information and belief, instead of using existing resources, such as Old Central Booking, Central Booking or the numerous precincts throughout the City as the reception point for Mr. Dunlop and others arrested during the relevant period – including the at least twenty (20) precincts in Manhattan, all of which were capable of adequately processing arrestees – Defendants deliberately devised a plan that was intended to unreasonably lengthen the stay in custody of anyone arrested during the RNC, including Mr. Dunlop, and to make the terms of confinement as difficult, intimidating and unsafe as they thought possible.

51. Mr. Dunlop was then taken in the police vehicle to a holding facility at the Chelsea Piers and placed in a makeshift cell with approximately one hundred other individuals. Once inside, Mr. Dunlop observed multiple holding cells inside Pier 57 constructed with chain-link fence topped with razor wire. The cell that Mr. Dunlop was placed in had two sections, one in which he was kept, and another buffer zone, which contained a portable toilet. Upon arrival at Pier 57, Mr. Dunlop was searched, had his property confiscated,

and was placed in one of the holding cells.

52. Upon information and belief, according to published reports, of which Defendants knew or should have known, numerous environmental inspections of Pier 57 in 2001 and early 2004 uncovered safety and health hazards including easily disturbed asbestos particles, lack of adequate fire protection systems, and floors covered with black oily soot.

53. Upon information and belief, there was a chemical-like smell that emanated throughout the facility that caused Mr. Dunlop to feel ill during his detention.

54. Upon information and belief, there was inadequate seating to accommodate all the people in the cell and therefore, Mr. Dunlop stood for hours through the night to avoid sitting on the dirty and grease covered floor. There were no beds or cots, no blankets and no pillows in the cell, making it impossible for Mr. Dunlop to sleep or even lie down.

55. Upon information and belief, Mr. Dunlop observed individuals in pain who were not given medical attention.

56. Mr. Dunlop began to feel ill as his clothes had been drenched in sweat while in the police vehicle. This was compounded as Chelsea Piers was damp and cold causing Mr. Dunlop to develop a cough and fever like conditions.

57. During his entire stay at Pier 57, Mr. Dunlop was only given one box of cereal to eat with his hands which had become soiled from the grease and dirt at Chelsea Piers.

58. Upon information and belief, Mr. Dunlop was unable to ascertain from the NYPD or Corrections what was happening or why he had been arrested. Mr. Dunlop asked a member of the NYPD, at Chelsea Piers "What is happening?" to which the Officer responded, "You have the right to shut the fuck up, I suggest you exercise that right."

59. Mr. Dunlop remained at Chelsea Piers until the next morning when he was transferred to

100 Centre Street, New York, NY in a New York City Department of Corrections Bus.

60. Upon arriving at 100 Centre Street, Mr. Dunlop was again searched, fingerprinted, and placed in another cell at 100 Centre Street. Mr. Dunlop attempted to talk to various members of the NYPD and Corrections to ascertain his status and when he would be able to see a lawyer to which he was told that he was a "whiney kid."

61. At all times Mr. Dunlop was aware of his confinement and did not consent to being arrested or confined.

62. On August 28, 2004, Mr. Dunlop was not brought to arraignment part until after 6:30 in the evening, where he was finally permitted to meet with a lawyer.

63. Despite the fact that there was no probable cause to arrest Mr. Dunlop, he was charged and prosecuted under New York City docket 2004NY063485 by the DA's Office for Obstruction of Governmental Administration in the Second Degree, Disorderly Conduct, Parading Without a Permit, and Resisting Arrest.

64. The supporting deposition of the arresting officer, OFFICER GOMEZ charges in sum and substance that Mr. Dunlop obstructed traffic by riding his bicycle across all lanes of traffic and refused a lawful order and struggled with her when Mr. Dunlop resisted arrest.

65. The Defendants including but limited to the CITY OF NEW YORK, BLOOMBERG, KELLY, ESPOSITO, COLGAN and GRAHAM acting at the behest and in concert with the RNC conspired with the RNC to violate the constitutional rights of those in or around the RNC protests by designing and implementing a plan to arrest those in the vicinity of the RNC protest, those who were peacefully protesting or those who appeared to protest the policies of the Republican National Party, in violation of their constitutional rights.

66. Upon information and belief, this plan included but was not limited to removing

individuals from the street who were lawfully participating in, observing or in the area of the RNC protest in violation of their constitutional rights and upon such information and belief the plan was to take the protest and negative publicity surrounding the protest and the Republican National Party out of the public eye.

67. The Defendants, including but limited to the CITY OF NEW YORK videotaped the activities in or around the RNC protests.

68. Upon information and belief in or around the fall of 2004, the Defendants including but not limited to MORGANTHAU, ADA CONCANNON, JOHN ROE TECHNICIANS, OFFICER DOE, acting at the behest and in concert with the each other intentionally removed evidentiary images of Mr. Dunlop behaving peacefully, not blocking traffic, not resisting arrest, not parading without a permit and not in violation of any law. The removal of these images was part of a plan and conspiracy by DA's Office the NYPD, the Defendants including but not limited to MORGANTHAU, ADA CONCANNON, and JOHN ROE TECHNICIANS to alter, fabricate, and manufacture knowingly false evidence to be used against Mr. Dunlop in violation of Mr. Dunlop's constitutional rights.

69. Upon information and belief, this plan was orchestrated, and carried out by NYPD Technical Assistance and Response Unit (TARO), the DA's Office, and/or the Defendants, including but limited to the CITY OF NEW YORK, MORGANTHAU, ADA CONCANNON, and ROES willfully altered and/tampered with evidence, and conspired to alter and/or tamper with evidence.

70. The actions of NYPD Technical Assistance and Response Unit (TARO), DA's Office and/or the Defendants, the CITY OF NEW YORK, MORGANTHAU, ADA CONCANNON, and ROES are, at best, relating to the organization, evaluation, and

marshalling of evidence, which is an activity of police nature, and is therefore not entitled to absolute protection.

71. ADA CONCANNON, assigned to prosecute Mr. Dunlop's case under the supervision of Defendant, MORGENTHAU, produced a VHS video tape that was taped by the NYPD and was to be submitted as evidence of Mr. Dunlop's alleged unlawful conduct, (hereinafter, "First Video Tape"), knowing that it was an altered and manufactured piece of evidence used to maliciously prosecute Mr. Dunlop, and deprive him of his constitutional rights.

72. Defendant, including but limited to ADA CONCANNON in her capacity as an Assistant District Attorney for New York County, in furtherance of the conspiracy, with an intent to maliciously prosecute and deprive Mr. Dunlop of his constitutional rights, knowingly made false representations in court that the First Video Tape was a complete and unedited version of the events that transpired immediately preceding and including Mr. Dunlop's arrest.

73. Upon information and belief, although OFFICER GOMEZ never observed Mr. Dunlop until after being apprehended and cuffed by OFFICER JOHN DOE, OFFICER GOMEZ in her corroborating affidavit submitted in connection with this prosecution stated that she had personally observed Mr. Dunlop committing the above offenses and that he had "flailed" his arms to resist being arrested.

74. The actions of NYPD Technical Assistance and Response Unit (TARO), and/or the CITY OF NEW YORK, MORGANTHAU, his employees including but not limited to ADA CONCANNON, and ROES are a misuse of investigative techniques and privileges.

75. The actions of NYPD Technical Assistance and Response Unit (TARU), and/or the CITY

OF NEW YORK, MORGANTHAU, his employees including but not limited to ADA CONCANNON, and ROES are in bad faith.

76. Months into the case, a second videotape, (hereinafter, "Second Video Tape") also recorded by the NYPD and submitted by MORGANTHAU as evidence in a different criminal case, when compared with the First Video Tape to be submitted as evidence in Mr. Dunlop's case, upon information and belief, revealed that they were shot from the identical NYPD video camera. When run simultaneously side-by-side it is revealed that the First Video Tape had been edited in two places, in both cases removing images showing Mr. Dunlop behaving peacefully, not obstructing traffic, not parading nor attempting to avoid arrest.

77. Also cut from the First Video Tape was footage of Officer John Doe, the actual officer who placed Mr. Dunlop under arrest. In the Second Video Tape, Officer Gomez is nowhere to be seen.

78. Upon revelation in court of the Second Video Tape, MORGANTHAU was forced to drop all criminal charges against Mr. Dunlop and upon information and belief, later admitted that a technician in the DA's Office ("JOHN ROE") whose name and identity was not provided to Mr. Dunlop, had cut the material.

79. Upon information and belief, Barbara Thompson, a spokeswoman for the DA's Office stated on at least on occasion in or around April of 2005 that the tape had been cut by the DA's office.

80. The Defendants, including but not limited to the CITY OF NEW YORK, MORGANTHAU, ADA CONCANNON, and JOHN ROEs acted in concert with the NYPD to cut the tapes and conspire against Mr. Dunlop to fabricate false evidence

against Mr. Dunlop.

81. As a result of the Defendant's CITY OF NEW YORK, MORGANTHAU, ADA
CONCANNON, and JOHN ROEs illegal acts, Mr. Dunlop was unlawfully arrested and
held against his will and sustained bodily and emotional injury as a result. Mr. Dunlop is
now afraid to approach the NYPD or other official officers if he were to be in need of
assistance.

82. Defendants, including but not limited to the CITY OF NEW YORK, MORGANTHAU,
ADA CONCANNON, and JOHN ROEs deprived Mr. Dunlop of his freedom
intentionally, subjected him to deplorable conditions, maliciously prosecuted and
otherwise injured Mr. Dunlop.

83. Mr. Dunlop was subjected to unreasonable, unnecessary and punitive conditions of
confinement in violation of the First, Fourth, Fifth, Sixth and Fourteenth Amendments to
the United States Constitution and the Constitution and laws of the State of New York.
These conditions included, but were not limited to, the following: 1) false arrest and
imprisonment; 2) excessively tight handcuffs applied for excessive periods of time
without cause; 3) unreasonable overcrowding; 4) inadequate facilities for sleeping and
sitting, causing Mr. Dunlop to come into intimate contact with toxic chemicals and other
noxious substances; 5) deliberately indifferent denial of access to necessary medication
and medical attention when suffering from medical conditions and illness; 6) deliberately
indifferent exposure to dangerous chemicals in the air and on the walls and floor of "Pier
57," including asbestos, chlorinated hydrocarbons, benzene and others, some of which
are carcinogenic, mutagenic, teratogenic, and hepatogenic and which cause many other
diseases and conditions and have caused fear of contracting cancer and other unknown

diseases at some time in the future; 7) notwithstanding the extensive levels of toxic

chemicals and dirt, among other things, the deliberately indifferent refusal to provide

adequate sanitation; 8) the deliberately indifferent denial, in many instances of adequate

food, often due to the incredibly unsanitary conditions, and of water; and 9) refusal of

access to counsel for many hours.

84. Defendants, including but not limited to THE CITY OF NEW YORK, BLOOMBERG,

KELLY, ESPOSITO GRAHAM , conspired with the Republican National Party to create

a policy of arresting without probable cause, individuals who were in the vicinity of those

engaging in lawful and peaceful expressions of their First Amendment rights in violation

of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution

and the Constitution and laws of the State of New York.

## AS FOR THE FIRST CAUSE OF ACTION
## FALSE ARREST AND IMPRISONMENT

85. Mr. Dunlop repeats and realleges and incorporates by reference the allegations in

paragraphs "1" to "84" above with the same force and effect as if herein set forth.

86. Defendants, including but not limited to THE CITY OF NEW YORK, BLOOMBERG,

KELLY, ESPOSITO and GRAHAM , conspired with the Republican National Party

implemented policies and procedures permitting the unlawful arrest of peaceful

individuals, including Mr. Dunlop because they were in the vicinity of the RNC.

87. Dunlop was peacefully and lawfully in the area of the RNC at the time of his arrest and

was not in violation of any applicable local, state or federal law.

88. That at no time did Dunlop intentionally obstruct, impair or pervert the administration of

law or pervert a public servant from performing an official function, by interference, or

by means of any independent unlawful act.

89. Defendants arrested and confined Mr. Dunlop without probable cause to believe a crime was committed or without a warrant to do so.

90. At all times relevant herein, Defendants, including but not limited to THE CITY OF NEW YORK, BLOOMBERG, KELLY, ESPOSITO and GRAHAM acted with the intention of confining Dunlop within fixed boundaries, the acts directly or indirectly resulted in confinement, and Dunlop was conscious of the confinement.

91. Defendants, including but not limited to THE CITY OF NEW YORK, BLOOMBERG, KELLY, ESPOSITO and GRAHAM, imposed by force or threats unlawful restraint upon his freedom of movement, to wit by arresting him, twisting his arms, handcuffing and tightening said cuffs in a manner intended to cause Dunlop pain.

92. Dunlop was confined by the Defendants for almost twenty-four hours for an offense for which no probable cause existed.

93. All charges against Dunlop were dismissed as it was revealed that the Defendants had no probable cause to effectuate the arrest.

94. As a direct and proximate result of the conduct of Defendants, Dunlop suffered harm and damages including but not limited to the aforesaid damages.

95. The conduct occurred while the NYPD and Corrections, OFFICER GOMEZ, JOHN DOEs, and others were on duty and in uniform, in and during the course and scope of their duties and functions as New York City police officers, and while they were acting as agents and employees of Defendants CITY OF NEW YORK and the NYPD. Thus Defendant CITY OF NEW YORK is liable to Dunlop pursuant to the state common law doctrine of *respondeat superior*.

## AS FOR THE SECOND CAUSE OF ACTION
### ASSAULT

96. Mr. Dunlop repeats and realleges and incorporates by reference the allegations in paragraphs "1" to "95" above with the same force and effect as if herein set forth.

97. Defendants, including but limited to the CITY OF NEW YORK, OFFICER GOMEZ and JOHN DOES intentionally created and caused Mr. Dunlop to be in fear of physical harm, by restricting his freedom of movement by arresting him unlawfully, placing handcuffs on him against his will, confining him unlawfully for no known or lawful purpose other than to create in Dunlop an apprehension of immediate physical harm.

98. Upon information and belief that the defendants, including but not limited toOFFICER GOMEZ, and JOHN DOES made physical contact with Mr. Dunlop, which included seizing him, handcuffing him which was not privileged, was nonconsensual and offensive and which constituted battery.

99. Defendants confined Mr. Dunlop in such a manner that caused him to become ill by placing him in a closed city vehicle for hours without water or ventilation, and further confining him.

100.     Any reasonable person would also become apprehensive in the face of Defendants' threatening conduct.

101.     The conduct of Defendants occurred while they were on duty and in uniform, in and during the course and scope of their duties and functions as New York City police officers, and while they were acting as agents and employees of Defendant CITY OF NEW YORK. Thus Defendant CITY OF NEW YORK is liable to Dunlop pursuant to the state common law doctrine of *respondeat superior*.

## AS FOR THE THIRD CAUSE OF ACTION
### BATTERY

102.     Mr. Dunlop repeats and realleges and incorporates by reference the allegations in

paragraphs "1" to "101" above with the same force and effect as if herein set forth.

103.     Without the consent of Mr. Dunlop, the Defendants intentionally, harmfully, and

offensively touched Mr. Dunlop by handcuffing him, grabbed him by the neck and

pushed in a downward direction as his arms were grabbed and twisted behind him in a

manner exercising excessive force causing Mr. Dunlop substantial pain.

104.     The conduct of Defendants, including but limited to OFFICER GOMEZ, and

JOHN DOES, occurred while they were on duty and in uniform, in and during the course

and scope of their duties and functions as New York City police officers, and while they

were acting as agents and employees of Defendant CITY OF NEW YORK.  Thus

Defendant CITY OF NEW YORK is liable to Mr. Dunlop pursuant to the state common

law doctrine of *respondeat superior*.


## AS FOR THE FOURTH CAUSE OF ACTION
### MALICIOUS PROSECUTION

105.     Mr. Dunlop repeats and realleges and incorporates by reference the allegations in

paragraphs "1" to "104" above with the same force and effect as if herein set forth.

106.     That upon information and belief, Defendants, including but not limited to the

CITY OF NEW YORK, MORGANTAHU and ADA CONCANNON improperly and

knowingly commenced a criminal process against Mr. Dunlop without probable cause.

107.     The prosecution, criminal charges, and hearings were instituted and procured by

the Defendants, including but not limited to the CITY OF NEW YORK, KELLY,

ESPOSITO, GRAHAM, COLGAN, OFFICER GOMEZ, MORGANTHAU, ADA
CONCANNON, JOHN DOES and JOHN ROES which terminated when Defendant
dismissed the charges. Defendants MORGANTHAU, ADA CONCANNON and other
servants and employees of MORGANTHAU had actual malice in prosecuting Mr.
Dunlop and as a result, Mr. Dunlop sustained injury.

108.     Mr. Dunlop was lawfully walking when he was arrested and later charged with
several criminal offenses.

109.     OFFICER GOMEZ swore in the criminal complaint stating that she personally
observed Mr. Dunlop committing the offenses charged.

110.     Defendants submitted evidence, namely the corroborating affidavit and Video
Tape 1 that they knew or should have known was false in order to uphold the arrest and
secure the prosecution of Mr. Dunlop.

111.     Upon information and belief, after the complete depiction of the events surfaced,
as evidenced in the Second Tape, OFFICER GOMEZ was unable to recall or state with
certainty any of the specifics of the complaint which were based on her supporting
deposition, filed in connection with the arrest and proffering of charges against Mr.
Dunlop.

112.     Upon reviewing Video Tape 2, Defendants the CITY OF NEW YORK,
MORGANTHAU, and ADA CONCANNON were forced to drop all charges against Mr.
Dunlop.

113.     As a result of Defendant's conduct, Mr. Dunlop was unlawfully confined and
prosecuted. Mr. Dunlop sustained physical and emotional damages, to which the full
extent is not known.

114. The conduct of Defendants occurred while they were on duty and in uniform, in and during the course and scope of their duties and functions as New York City officers, and while they were acting as agents and employees of Defendants CITY OF NEW YORK. The conduct of Defendants including but not limited to technician JOHN DOE occurred during the course and scope his or her duty and employment with the CITY OF NEW YORK and MORGANTHAU. The conduct of defendant ADA CONCANNON occurred during the course of her employment with the CITY OF NEW YORK and MORGANTHAU. Thus Defendant CITY OF NEW YORK is liable to Mr. Dunlop pursuant to the state common law doctrine of *respondeat superior*.

### AS FOR THE FIFTH CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

115. Mr. Dunlop repeats and realleges and incorporates by reference the allegations in paragraphs "1" to "114" above with the same force and effect as if herein set forth.

116. Defendants continually negligently inflicted emotional distress on Mr. Dunlop.

117. Defendants, including but not limited to the CITY OF NEW YORK, BLOOMBERG, KELLY, ESPOSITO, implemented policies, practices, or customs of detaining individuals arrested at or in the vicinity of the RNC, without justification, in conditions that were deliberately cruel, inhumane, unhealthy, and dangerous. Mr. Dunlop was subjected to these policies and practices for being in the vicinity of the RNC.

118. Defendant confined Mr. Dunlop for many hours in a cage that lacked adequate benches or other means whereby to adequately sit, rest and/or sleep, under conditions which were cold, loud and uncomfortable, due to the continuous use of large fans which ran at top speeds, which, given the presence of numerous toxic chemicals present at Pier 57, was

24

particularly inappropriate.

119. On information and belief, the floors of the cages in Pier 57 were covered with numerous highly toxic chemicals and substances. The floors of the cages in Pier 57 were also covered in other dirt and grime.

120. Mr. Dunlop was humiliated and embarrassed by NYPD personnel when he attempted to find out what was happening with his case and when he complained of the deplorable conditions.

121. Mr. Dunlop was taunted and verbally abused by NYPD personnel and Corrections personnel who cursed and otherwise mistreated Mr. Dunlop without justification.

122. On information and belief, at no time did the Defendants ever obtain a Certificate of Occupancy for Pier 57 which would have permitted the holding of human beings therein.

123. In addition, Mr. Dunlop was subjected to excessive and unnecessary handcuffing, including the continued handcuffing and tightening of handcuffs to the point of breaking the skin and even after he was lodged in the detention facility at Pier 57.

124. Defendants have a duty to perform their professional services in such manner as not to inflict emotional distress on Mr. Dunlop.

125. Defendants by the above reference acts violated that duty.

126. Mr. Dunlop never interfered with Defendants' obligations under the above described duties.

127. As a result of Defendant negligent conduct, Mr. Dunlop has suffered and will continue to suffer physical pain, anguish, severe emotional trauma, embarrassment and humiliation.

128. The conduct of Defendant police officers, GOMEZ and JOHN DOE'S, occurred while

they were on duty and in uniform, in and during the course and scope of their duties and functions as New York City police officers, and while they were acting as agents and employees of Defendant CITY OF NEW YORK. Thus Defendant CITY OF NEW YORK is liable to Mr. Dunlop pursuant to the state common law doctrine of *respondeat superior*.

## AS FOR THE SIXTH CAUSE OF ACTION
### NEGLIGENCE

129. Mr. Dunlop repeats and realleges and incorporates by reference the allegations in paragraphs "1" to "128" above with the same force and effect as if herein set forth.

130. Defendants CITY OF NEW YORK, BLOOMBERG, KELLY, ESPOSITO, COLGAN and GRAHAM's owed a duty to supervise and/or train the officers and to take steps to prevent events such as occurred here, to wit, the false arrest and imprisonment and the swearing of the charges without probable cause.

131. Defendants, including but not limited to the CITY OF NEW YORK, OFFICER GOMEZ, JOHN DOES owed a duty to act according to the ordinary care of a police officer, to wit, to conduct a proper investigation, the failure of which was the proximate cause of Mr. Dunlop's injury.

132. Defendants, including but not limited to the CITY OF NEW YORK, KELLY, ESPOSITO, COLGAN and GRAHAM OFFICER GOMEZ, JOHN DOES breached that duty by failing to act as an ordinary Police Officer, Police Commissioner, and supervisor would act, to wit by failing to perform his duties and by failing adequately to control and to supervise his officers.

133. Defendants, including but not limited to the CITY OF NEW YORK, JOHN ROES,

ADA CONCANNON, and MORGANTHAU failed to intercede when the Video Tape 1 was altered and removed exculpatory evidence of Mr. Dunlop.

134. Defendant MORGENTHAU and ADA CONCANNON owed a duty to act according to the ordinary care of a District Attorney and an Assistant District Attorney, the failure of which was the proximate cause of Mr. Dunlop's injuries.

135. Defendant MORGANTHAU breached that duty by failing to act as an ordinary District Attorney by failing to adequately control and supervise technicians and employees, including but not limited to ADA CONCANNON and JOHN ROEs, who deleted exculpatory evidence from the First Video Tape

136. Defendant MORGANTHAU breached that duty by failing to act as an ordinary District Attorney by failing to adequately train Assistant District Attorneys to turn over *Brady* material.

137. Defendant ADA CONCANNON owed a duty to act according to the ordinary care of a District Attorney, the failure of which was the proximate cause of Mr. Dunlop's injuries.

138. As a result of those breaches, which were the proximate cause of Mr. Dunlop's injury, Mr. Dunlop suffered harm and damages.

139. The conduct of Defendant OFFICER GOMEZ and JOHN DOE'S, occurred while they were on duty and in uniform, in and during the course and scope of their duties and functions as New York City police officers, and while they were acting as agents and employees of Defendants CITY OF NEW YORK and NEW YORK CITY POLICE DEPARTMENT. Thus Defendant CITY OF NEW YORK is liable to Mr. Dunlop pursuant to the state common law doctrine of respondeat superior.

140. The conduct of Defendants, including but not limited to MORGENTHAU, ADA

CONCANNON, and JOHN ROE occurred during the course and scope of their duties

and functions as New York City agents and employees of Defendants CITY OF NEW

YORK. Thus Defendant CITY OF NEW YORK is liable to Mr. Dunlop pursuant to the

state common law doctrine of *respondeat superior*.

### AS FOR THE SEVENTH CAUSE OF ACTION
### VIOLATIONS OF 42 U.S.C § 1983 ARREST

141. Mr. Dunlop repeats and realleges and incorporates by reference the allegations in

paragraphs "1" to "140" above with the same force and effect as if herein set forth.

142. At all times relevant herein, the conducts of all Defendants were subject to 42 U.S.C. §

1983.

143. Acting under the color of law, Defendants, worked a denial of Mr. Dunlop's rights,

privileges or immunities secured by the United States Constitution or by Federal law to

wit,

(a) by depriving Mr. Dunlop of his liberty without due process of law, by taking him

into custody and holding him there against his will,

(b) by making an unreasonable search and seizure of his property without due

process of law,

(c) by conspiring for the purpose of impeding and hindering the due course of

justice, with intent to deny Mr. Dunlop equal protection of law,

(d) by refusing or neglecting to prevent such deprivations and denials to Mr. Dunlop,

thereby depriving Mr. Dunlop of his rights, privileges, and immunities as guaranteed

by the Fourth Fifth and Fourteenth Amendments to the Constitution of the United

States.

144. Defendants, including but not limited to BLOOMBERG, KELLY, ESPOSITO, GRAHAM, and COLGAN, are liable under the doctrine of *respondeat superior*

## AS FOR THE EIGHTH CAUSE OF ACTION
## VIOLATIONS OF 42 U.S.C 1983 DETENTION AND CONFINEMENT

145. Mr. Dunlop repeats and realleges and incorporates by reference the allegations in paragraphs "1" to "144" above with the same force and effect as if herein set forth.

146. As a result of their concerted unlawful and malicious detention and confinement of Mr. Dunlop, Defendants deprived Mr. Dunlop of both his right to his liberty without due process of law and his right to equal protection of the laws, and due course of justice was impeded, in violation of the Fifth and Fourteenth Amendments of the Constitution of the Unite States and 42 U.S.C. § 1983.

147. Defendants CITY OF NEW YORK, KELLY, ESPOSITO, GRAHAM, and COLGAN, are liable under the doctrine of *respondeat superior.*

## AS FOR THE NINTH CAUSE OF ACTION
## VIOLATIONS OF 42 U.S.C 1983 REFUSING OR NEGLECTING TO PREVENT

148. Mr. Dunlop repeats and realleges and incorporates by reference the allegations in paragraphs "1"to "146" above with the same force and effect as if herein set forth.

149. At all times relevant to this Complaint, Defendants OFFICER GOMEZ and JOHN DOES 1-3 were acting under the direction and control of Defendants including but not limited to the CITY OF NEW YORK, BLOOMBERG, KELLY, ESPOSITO, GRAHAM, COLGAN.

29

150. Acting under color of law and pursuant to official policy or custom defendants, including but not limited to KELLY, ESPOSITO, GRAHAM, COLGAN, knowingly, recklessly, or with gross negligence failed to instruct, supervise, control, and discipline on a continuing basis Defendants OFFICER GOMEZ, and JOHN DOE'S 1-3 in their duties to refrain from:

   (a) unlawfully and maliciously harassing Mr. Dunlop who was acting in accordance with his constitutional and statutory rights, privileges and immunities,

   (b) unlawfully and maliciously arresting, imprisoning and prosecuting Mr. Dunlop who was acting in accordance with his constitutional and statutory rights, privileges and immunities,

   (c) conspiring to violate the rights, privileges and immunities guaranteed to Mr. Dunlop by the Constitution and laws of the United States and the laws of the State of New York,

   (d) otherwise depriving Mr. Dunlop of his constitutional and statutory rights, privileges, and immunities.

151. Defendants, including but not limited to KELLY, ESPOSITO, GRAHAM, COLGAN, had knowledge or, had they diligently exercised their duties to instruct, supervise, control and discipline on a continuing basis, should have had knowledge that the wrongs conspired to be done, as heretofore alleged, were about to be committed. Defendants OFFICER GOMEZ and JOHN DOE'S had the power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with gross negligence failed or refused to do so.

152. Defendants KELLY, ESPOSITO, GRAHAM, COLGAN, are liable under the doctrine

of *respondeat superior.*

153. As a direct and proximate cause of the negligent and intentional acts of Defendants set forth in paragraphs above, Mr. Dunlop suffered physical injury, loss of income, and severe mental anguish in connection with the deprivation of his constitutional and statutory rights guaranteed by the Fifth and Fourteenth Amendments of the Constitution of the United States and protected by 42 U.S.C. § 1983.

## AS FOR THE TENTH CAUSE OF ACTION
## VIOLATIONS OF 42 U.S.C. § 1983 FOR CONSPIRACY

154. Mr. Dunlop repeats and realleges and incorporates by reference the allegations in paragraphs "1" to "153" above with the same force and effect as if herein set forth.

155. All Defendants (a) had an objective to be accomplished; (b) had an agreement on the object or course of action; (c) preformed one or more unlawful overt acts; and (d) caused Mr. Dunlop damages that were a direct result of those acts.

156. In furtherance of their object, Defendants did two or more overt acts against Mr. Dunlop.

157. Those unlawful overt acts include, but are not limited to the following: Defendants advised and strategize, practices or customs of detaining the individuals arrested at the RNC, without justification, in conditions that were deliberately cruel, inhumane, unhealthy, dangerous, illegal and unconstitutional.

158. Just before and during the RNC, Defendants implemented this policy, practice or custom, in an arbitrary and capricious manner, and in the absence of the existence of probable cause, to arrest entire groups of people who were lawfully engaged in protected

First Amendment activity or were observing such activity, or were simply passing by at the time arrests were being made.

159. Upon information and belief, on August 27, 2004, the day that Mr. Dunlop was arrested, and at various times prior to that date, David Norcross, Chairman of the Committee on Arrangements for the 2004 Republican National Convention stated on more than one occasion that the CITY OF NEW YORK and the Republican National Committee had met and discussed security for the RNC for at leas a year prior to the convention.

160. Upon information and belief, on or before August 27, 2004, David Norcross had conversations with BLOOMBERG and other CITY OF NEW YORK officials regarding controlling the visibly negative publicity surrounding the RNC.

161. Upon information and belief, these conversations included but were not limited to the promulgation and implementation of a practice, tactic or strategy to keep visible signs of dissent and/or protest out of the public eye, out of the media, and off the streets of New York City. This included but was not limited to mass arrests of those in the vicinity of the protest and those who were peacefully observing the protest, the intimidation factor of police officers in full riot gear, the use of horses to disperse bystanders, the arrest and confinement of those charged with minor offenses instead of issuing desk appearance tickets so as to minimize the visible effect of dissenters, confiscation of bicycles and other personal property as "evidence", routing bystanders and observers to areas where they would be arrested unlawfully, and falsely arresting large groups of people without probable cause and then falsely prosecute these individuals with altered evidence.

162. Defendants knew or should have known that Mr. Dunlop was held for many hours in a holding cell that lacked adequate means whereby to adequately sit, rest and/or sleep, under inhumane conditions.

163. Defendants knew that their arrest policy surrounding the RNC was a refinement of the tactic employed recently by Defendants at other demonstrations which had recently taken place in the City, including, *inter alia*, the February 15, 2003 anti-war march, *see Haus, et al., v. City of New York, et al.*, 03 Civ. 4915 (RWS), and the April 7, 2003 Carlyle Group protest, see *Larsen, et al., v. City of New York, et al.* 04 Civ. 665 (RWS), of using mass arrests to unlawfully suppress protected First Amendment conduct.

164. Defendants had knowledge or, had they diligently exercised their duties to instruct, supervise, control and discipline on a continuing basis, should have had knowledge that the wrongs conspired to be done, as heretofore alleged, were about to be committed. Defendants had the power to prevent or aid in preventing the commission of said wrongs, could have done so by reasonable diligence, and knowingly, recklessly, or with gross negligence failed or refused to do so.

165. Upon information and belief, Defendants agreed that the object or course of action was to arrest, detain and confine Dunlop and others in the vicinity of the RNC without probable cause, and maliciously charge and prosecute him with crimes.

166. Upon information and belief, Defendants conspired as herein alleged in or around October of 2003, at which time Defendants, including but not limited to KELLY, ESPOSITO, GRAHAM, and COLGAN, planned and agreed upon how to arrest, detain and confine individuals who were participating in, observing or within the vicinity of the

RNC protests without probable cause and to knowingly and maliciously charge and prosecute Dunlop and others with crimes that they did not commit.

167. Upon information and belief, Defendants including but not limited to KELLY, ESPOSITO, GRAHAM, and COLGAN, and other members of the NYPD conspired as herein alleged in or around November of 2003, at which time Defendants planned and agreed upon how to mass arrest, detain and confine individuals without individualized suspicion, who were within the vicinity of the RNC protests without probable cause and maliciously charge and prosecute Dunlop and others with crimes they did not commit.

168. Upon information and belief, Defendants including but not limited to KELLY, ESPOSITO, GRAHAM, and COLGAN and other members of the NYPD conspired as herein alleged at a meeting on or about November of 2003, at which time Defendants planned and agreed upon how to arrest, detain and confine individuals who were within the vicinity of the RNC protests without probable cause and maliciously charge and prosecute Dunlop and others with crimes they did not commit.

169. Upon information and belief, Defendants including but limited to KELLY, ESPOSITO, GRAHAM, and COLGAN and other members of the NYPD conspired as herein alleged at a meeting on or about January of 2004, at which time Defendants collaborated and conspired with the United States Secret Service and all planned and agreed upon how to arrest, detain and confine individuals who were within the vicinity of the RNC protests without probable cause and agree to maliciously charge and prosecute individuals without lawful justification.

170. Upon information and belief, Defendants including but not limited to KELLY, ESPOSITO, GRAHAM, and COLGAN and other members of the NYPD conspired as

herein alleged at a meeting which took place on or about February 19, 2004, at which Defendants (including but not limited to Deputy Inspector Matthew Pontillo) planned and agreed upon how to arrest, detain and confine Dunlop and others in the vicinity of the RNC without probable cause and maliciously charge and prosecute Dunlop and others with crimes.

171. Upon information and belief, Defendants including but not limited to KELLY, ESPOSITO, GRAHAM, and COLGAN and other members of the NYPD conspired as herein alleged at a meeting which took place on or about May 3, 2004, at which Defendants planned and agreed upon how to arrest, detain and confine Dunlop and others in the vicinity of the RNC without probable cause and maliciously charge and prosecute Dunlop and others with crimes.

172. Upon information and belief, Defendants including but not limited to KELLY, ESPOSITO, GRAHAM, and COLGAN and other members of the NYPD conspired as herein alleged at a meeting on or about May 5, 2004, at which Defendants collaborated and conspired with the United States Secret Service and all planned and agreed upon how to conduct mass arrests, detain and confine Dunlop and others in the vicinity of the RNC without probable cause and maliciously charge and prosecute Dunlop and others with crimes.

173. Upon information and belief, Defendants, including but not limited to KELLY, ESPOSITO, GRAHAM, and COLGAN and other members of the NYPD conspired as herein alleged at a meeting on or about July 21, 2004, at which Defendants collaborated and conspired with the United States Secret Service and all planned and agreed upon how to conduct mass arrests, detain and confine Dunlop and others in the vicinity of the RNC

without probable cause and maliciously charge and prosecute Dunlop and others with crimes.

174. Upon information and belief, Defendants including but not limited to KELLY, ESPOSITO, GRAHAM, and COLGAN and other members of the NYPD conspired as herein alleged at a meeting which took place on or about August 25, 2004, at which Defendants planned and agreed upon how to arrest, detain and confine Dunlop and others in the vicinity of the RNC without probable cause and maliciously charge and prosecute Dunlop and others with crimes.

175. Upon information and belief, Defendants including but not limited to KELLY, ESPOSITO, GRAHAM, and COLGAN and other members of the NYPD conspired as herein alleged at a meeting or meetings, the dates of which are as yet unknown, at which Defendants planned and agreed upon how to arrest, detain and confine Dunlop and others in the vicinity of the RNC without probable cause and maliciously charge and prosecute Dunlop and others with crimes.

176. Defendants including but not limited to the CITY OF NEW YORK, MORGANTHAU, ADA CONCANNON, OFFICER GOMEZ, DOES and ROES conspired in or around September 2004 to create, manufacture and fabricate knowingly false evidence which was used against Mr. Dunlop so as to deprive him of his constitutional rights and to maliciously prosecute Mr. Dunlop for offenses for which no probable cause existed. This includes but is not limited to a the creation of a plan and decision by including but not limited to the CITY OF NEW YORK, MORGANTHAU, ADA CONCANNON, DOES and ROES to create a fabricated video tape, claiming to be evidence of Mr. Dunlop's unlawful acts which was used in the criminal case against Mr. Dunlop.

177. In or around September 2004, scenes showing Mr. Dunlop behaving peacefully and lawfully were removed by from the videotape by the NYPD Technical Assistance and Response Unit (TARU), and/or the CITY OF NEW YORK, MORGANTHAU, ADA CONCANNON, and ROES in furtherance of their conspiracy, and who then submitted this fabricated tape as evidence against Mr. Dunlop so as to unlawfully deprive him of his rights.

178. Defendants including but not limited to MORGANTHAU, ADA CONCANNON, and JOHN ROES had a duty not to create and manufacture evidence against Mr. Dunlop so as to deprive him of his constitutional rights.

179. Defendants CITY OF NEW YORK had a duty to ensure that employees, servants, and agents are properly trained and supervised so as to not create false evidence against defendants, to ensure that acts such as manufacturing of false evidence would be interceded and prevented, and to train its employees, servants and agents to turn over *Brady* material.

180. Defendants are liable under the doctrine of *respondeat superior*.

181. As a direct result of Defendants' acts, Dunlop suffered harm and damages that are a direct result of those acts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dunlop requests relief as follows:

(a)     Compensatory damages against Defendants jointly and severally for all causes of action; past and future, including, but not limited to pain and suffering, emotional

distress, economic losses including lost wages and medical expenses, violation of

rights and other losses and injuries, the full extent is still undetermined in an

amount to be determined at trial but in no event less than $10 MILLION

DOLLARS;

(b)     Punitive damages against the Defendants, jointly and severally for all causes of

action in an amount to be determined at trial but in no event less than $10

MILLION DOLLARS;

(c)     Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and as otherwise allowed

by law and the Court's inherent power;

(d)     Prejudgment interest as allowed by law;

(d)     Such other relief, as is just and proper under the circumstances.


## JURY DEMAND

Trial by jury is demanded on all issues for which a jury trial is available.


Dated:  January 12, 2007

Respectfully Submitted,

KURLAND & ASSOCIATES, P.C.

Gina M. Bobica, Esq. (GB-6615)
Attorneys for Plaintiff
304 Park Avenue South, Suite 206
New York, NY 10010
212.253.6911

EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDER DUNLOP, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **06-CV-433 (KMK) (JCF)** |
| vs. | ) **ECF** |
| | ) |
| THE CITY OF NEW YORK et al. | ) |
| | ) |
| Defendant(s). | ) |
| | ) |

## Declaration of Yetta G. Kurland

**YETTA G. KURLAND,** an attorney duly admitted to practice in the State of New York and before this Court, declares under the penalty of perjury, that the following statements are true and correct to the best of my knowledge:

1.      I am a Partner at Kurland, Bonica & Associates, P.C., f/k/a Kurland & Associates, P.C., attorneys for Plaintiff Alexander Dunlop (hereinafter " Plaintiff").

2.      I am familiar with the facts stated below and submit this declaration in support of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss.

3.      Defendant's attempt to claim that it did not conspire with other actors to achieve the misconduct alleged in Plaintiff's and literally hundreds of other complaints and thousands of other wrongful arrests during and around the 2004 Republican National Convention is at best disingenuous and perhaps not even believable to the Defendant, and at worst a purposeful misrepresentation and insult to this Court as this Court has seen already more than enough evidence within and outside this specific case to make it unquestionable that Defendant worked in concert with others to plan mass arrests, including throwing orange webs over large groups of

people, which it would be impossible to achieve due process or probable cause for the majority of which were so detained, hold these individuals for long periods of time beyond what was reasonable or legally allowable, and detain them in unsafe and inhumane conditions including a bus depot on the west side highway.

4.      These acts not only, on its face prove there must have been a conspiracy, but show that there was more than this conspiracy, in essence the plan was brought into fruition.

5.      To pretend that such matters did not happen is to boldly fly in the face of reality and insult the legal process by again attempting to deny Plaintiff his chance to one again have due process to have a jury determine whether or not the facts alleged in the 43 page summons and complaint occurred.

6.      Not only does the complaint outline specific conduct by defendant, but the results of such conduct speak for itself.

7.      It is so undisputed as to be a matter of public record and substantial news coverage that the Defendants worked with various New York City Agencies, individuals and entities, including the Hudson River Park Trust, the Secret Service and the Republican National Convention as well as many others, to plan a strategy to ensure that as little protesters as possible were seen during the RNC so that national media would not show them, so that the Republican National Convention would look welcomed by New Yorkers and so that the attendees of the convention would be unhampered by the overwhelming negative reception of such event.

8.      These plans included specific techniques developed in conjunction with those entities to wrongfully arrest individuals regardless of their legal and constitutional rights, to wrongfully detain them, for long periods of time, to keep them off the streets until the convention was over, to keep them in dangerous and illegal conditions separate and different than the normal

detainment location and conditions for normal arrestees, and in the case at hand, to tamper with evidence to purposefully frame them for crimes they did not commit.

9.    The fact these occurrences could not have happened without the pre-planning of the various agencies, entities and actors required to do so.

10.    Defendant takes issue with use of the word conspiracy due to its negative and dark connotations.  However, Defendant is not above the law, and the sad truth is that purposely making mass arrests without probable cause or due process, purposely holding arrestees who have committed no wrongdoing for inhuman amounts of time in inhuman conditions, and purposely falsifying evidence and attempting to frame these individuals for crimes that they know they did not commit, is very dark.

11.    For Defendant to try to again circumvent justice by denying Plaintiff the right to make his case to a jury and to have his day in Court to be heard is to ensure that this darkness permeates our criminal legal system.

12.    The conspiracy, namely that various parts of the government worked together, abusing its power to purposefully harm innocent individuals like Plaintiff is what makes Defendant's conduct so heinous.

13.    Defendants' motion to dismiss is a thinly veiled attempted by the Defendants to avoid culpability, to chip away at the Plaintiff's causes of action, and to deny Plaintiff his right and opportunity to be heard by this Court.

14.    The tapes alone establish enough prima facie evidence for the conspiracy claim to survive a summary judgment motion although, again this is not required and the pleadings are more than sufficient, just in the factual allegations contained therein.  The Defendants fall woefully short of meeting their burden to justify this dismissal, such a central part of Plaintiffs

3

claim. As such, this motion must be dismissed and Plaintiff must be allowed an opportunity to make his claim that Defendants conspired and purposely knew and intended to deprive him of his constitutional rights as articulated in the second amended verified complaint.

15.    Sufficient facts have been plead in the second amended verified complaint, which is significantly longer than the short and plain statement of the claim as minimally required by Fed. R. Civ. P. 8(a). The Defendants, in filing this motion, are attempting to deny Plaintiff his constitutional right to have his case heard by a jury. It is inappropriate for Defendants to use this motion to eliminate the cause of action from Plaintiff's complaint that Plaintiff alleges was predicated on the premeditated plan by various agencies to deprive Plaintiff and others similarly situated of their constitutional rights and then take numerous overt acts in furtherance of the plan.

KURLAND, BONICA & ASSOCIATES, P.C.
f/k/a KURLAND & ASSOCIATES, P.C.
Attorney for Plaintiff


By:_____
    Yetta G. Kurland (YK 1251)

4

EXHIBIT C

CRIMINAL COURT OF THE CITY OF NEW YORK

NEW YORK COUNTY  :   PART B

- - - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK     :    DOCKET NO.
                                             2004NY063485
                    - against -          :

ALEXANDER DUNLOP                         :

                              Defendant  :    Calendar Call

- - - - - - - - - - - - - - - - - - - -X

                            100 CENTRE STREET
                            NEW YORK, NEW YORK   10013

                            April 6, 2005


BEFORE:    HONORABLE SHAWNDYA SIMPSON, JUDGE



APPEARANCES:


            ROBERT MORGENTHAU, ESQ.
                District Attorney, New York County
                BY:  WILLA CONCANNON, ESQ.
                    Assistant District Attorney


            MICHAEL CONROY, ESQ.
                Attorney for Defendant
                116 John Street - Suite 2201
                New York, New York 10038



                            LAUREN K. GANZMAN
                            OFFICIAL COURT REPORTER

PROCEEDINGS                                              2

1          BRIDGE OFFICER:  Calendar No. 82, Alexander

2   Dunlop.

3          MR. CONROY:  Michael Conroy, 116 John Street,

4   Suite 2201, New York, New York.

5          Good morning, your Honor.

6          MS. CONCANNON:  Judge, this is my case.  The

7   People are not ready today; the officer was not

8   available, unfortunately.

9          MR. CONROY:  Your Honor, I want to address an

10  issue and I want to confirm, as I have -- I believe the

11  D.A. stated correctly three times now, that I was given

12  the complete and entire videotape of this incident

13  relating to what happened on Second Avenue and Tenth

14  Street for this date in question?

15         MS. CONCANNON:  Yes, that's correct.

16         MR. CONROY:  Then there is a major problem

17  here, your Honor.  I was contacted by the Lawyer's Guild

18  on Monday.  The tape that I have is not a complete tape;

19  it is a cut tape.  I went down to the Lawyer's Guild, I

20  compared a tape that they had gotten from an attorney on

21  another case.  Interestingly enough, two scenes

22  involving my client were cut out of the tape that I was

23  given by the District Attorney's Office.

24         MS. CONCANNON:  Judge, that is ridiculous.

25         MR. CONROY:  I have both tapes.

PROCEEDINGS

1      THE COURT:  Where did you get the tape?

2      MS. CONCANNON:  Exactly.  There are hundreds

3  of tapes of this event circulating from the National

4  Lawyer's Guild.  I certainly don't have access to those

5  tapes.

6      My duty to turn over to you any tapes I

7  have --

8      MR. CONROY:  It is an NYPD tape given to

9  another attorney, given to the Lawyer's Guild.  I have

10  both tapes.

11      MS. CONCANNON:  Now you have it, don't you?

12      MR. CONROY:  That's not the issue, judge.

13      THE COURT:  People, where did you get it from?

14      MS. CONCANNON:  We have several tapes --

15      THE COURT:  I mean the tape you gave counsel.

16      MS. CONCANNON:  New York City Police

17  Department detectives taping protests that night.  There

18  are hundreds of those tapes.

19      THE COURT:  You can find the officer who taped

20  it and you are free to cross-examine that person.

21      MR. CONROY:  I am going to make several

22  motions to the Court in writing.  One, this is bias on

23  the part of the police.  Someone, it appears

24  intentionally cut my client out of th

25      MS. CONCANNON:  Ou

PROCEEDINGS

1          MR. CONROY:  That is a serious problem.

2          MS. CONCANNON:  Listen --

3          MR. CONROY:  I want to know what officers

4    edited those tapes.

5          MS. CONCANNON:  There are no editing of any

6    tapes.

7          MR. CONROY:  I have never had this done to me

8    before in my entire life and I am offended.

9          MR. CONCANNON:  This is ridiculous.  There are

10   hundreds of tapes and every angle is not captured on

11   each tape.

12         THE COURT:  Approach.

13         (Off-the-record discussion held at the bench)

14         MR. CONROY:  Another matter, your Honor, which

15   is a concern, the People are answering not ready for

16   trial.  They answered not ready for trial on the last

17   date.  Immediately after that, they filed a certificate

18   of readiness.  It's my position that now, obviously,

19   that certificate of readiness is illusory and the entire

20   time should be charged.

21         MS. CONCANNON:  On the last date, the People

22   made a record the officer's close relatives were in a

23   very serious car accident, in intensive care, and it was

24   actually on the news because the accident was so

25   horrible.  So, certainly, that adjournment was

PROCEEDINGS

1    excludable because that --

2              THE COURT:  Today, she is sick?

3              MS. CONCANNON:  She is unavailable.  She is

4    still having issues with her family.

5              MR. CONROY:  If she is still having the same

6    issues from the prior date, how could they have filed a

7    certificate of readiness in the meantime to say they are

8    ready for trial?

9              MS. CONCANNON:  Because today she was not

10   available.  She was certainly available on the day we

11   filed the C.O.R.

12             MR. CONROY:  I have the record, obviously.

13             THE COURT:  You have the record and you can

14   file the 30.30 motion.  There are issues with the tape.

15   I suggest you get together, you can come back before the

16   Court and we can talk about it.  Your client is excused.

17   I'll put the case over for trial, if it comes to that.

18             MR. CONROY:  I'm scheduled to start a murder

19   trial on the 20th in front of Judge Berkman, so I would

20   ask for some date after April 20.

21             THE COURT:  Not a problem.  May 9; that's a

22   Monday.

23             What is the offer, People?

24             MS. CONCANNON:  The offer is 240.20 and time

25   served.  For the record, I would like to make a record

PROCEEDINGS

1   that the defendant is staring me down in an obnoxious

2   and intimidating way and I find it incredibly

3   inappropriate.

4           MR. CONROY:  Judge --

5           THE COURT:  I had enough of both you all right

6   now.  See you later, goodbye.

7           (SECOND CALL)

8           *         *         *         *

9           BRIDGE OFFICER:  Recalling Calendar No. 82,

10  Alexander Dunlop.

11          MR. CONROY:  Michael Conroy, 116 John Street,

12  Suite 2201, New York, New York.

13          (Off-the-record discussion held at the bench)

14          THE COURT:  Counsel, you can state --

15          MR. CONROY:  I waive my client's appearance,

16  with the Court's permission, for this calendar call.

17          MS. CONCANNON:  Judge, based on my discussion

18  with defense counsel and his showing me some further

19  evidence in the case, I am moving to dismiss the case; I

20  cannot prove these charges beyond a reasonable doubt.

21          MR. CONROY:  For the record, I would like to

22  thank the Assistant District Attorney for the work she

23  has done during her lunch hour.  I apologize for

24  anything I said this morning which may be read by

25  anybody as imputing the credibility as to the Assistant

PROCEEDINGS

1    District Attorney. That is not what I intended at all.

2    She has my full faith there was nothing done wrong here

3    by the District Attorney's Office and I join in the

4    motion for the dismissal.

5    THE COURT: That's granted. Contact your

6    client because we gave him a 5/9 adjourn date.

7    MR. CONROY: I will.

8    THE COURT: Dismissed and sealed.

9    MR. CONROY: Thank you very much.

10    *    *    *    *    *

11    CERTIFIED TO BE A TRUE AND ACCURATE

12    TRANSCRIPT OF THE MINUTES TAKEN IN THE

13    ABOVE-TITLED PROCEEDING.

14

15

16    LAUREN K. GANZMAN
      OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25

EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDER DUNLOP, | ) |
| Plaintiff, | ) ) |
| vs. | ) ) |
| THE CITY OF NEW YORK et al. | ) ) |
| Defendant(s). | ) ) ) |

<u>06-CV-433 (KMK) (JCF)</u>
<u>ECF</u>

<u>Declaration of Gina M. Bonica, Esq.</u>

**GINA M. BONICA,** an attorney duly admitted to practice in the State of New York and

before this Court, declares under the penalty of perjury, that the following statements are

true and correct to the best of my knowledge:

1.      I am a junior partner at Kurland, Bonica & Associates, P.C., f/k/a Kurland

& Associates, P.C., attorneys for Plaintiff Alexander Dunlop (hereinafter " Plaintiff").

2.      I am familiar with the facts stated below and submit this declaration in

support of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to

Dismiss.

3.      Pursuant to Plaintiff's alternative reliance on Federal Rule of Civil

Procedure 56(f), I submit that if the Court desires further specific facts to be set forth as

to the conspiracy claim, it should give the Plaintiff his deserved opportunity to make the

proper investigations through discovery.   Detailed below are several examples of

discovery information that Plaintiff would hope to obtain through discovery. This list is by no means exhaustive.

4.     Plaintiff would depose ASSISTANT DISTRICT ATTORNEY WILLA CONCANNON as to her knowledge of the chain of custody of the edited tape ("The Second Video Tape"), who actually gave The Second Video Tape to the District Attorney's Office, who actually edited The Second Video Tape, who ordered the editing of The Second Video Tape and which entity or Defendant oversaw such editing, how many others knew about the editing of The Second Video Tape, and why she originally stated that the tape submitted in Mr. Dunlop's criminal matter was unedited.

5.     Plaintiff would depose BARBARA THOMPSON, a spokeswoman for the District Attorney's Office as to her knowledge of the knowledge of the chain of custody of The Second Video Tape, why she alleged that The Second Video Tape had been cut by the District Attorney's Office, who ordered the editing of The Second Video Tape and which entity or Defendant oversaw such editing.

6.     In addition, in discovery, Plaintiff would also depose PO GOMEZ to determine why she submitted a sworn statement that the Plaintiff committed certain offenses for which he was arrested, only to have the unedited tape reveal that she was not only absent from the tape, and that the actions which she swore occurred, in actuality, did not.

7.     Discovery will also reveal, who from the NYPD edited that tape and determine from where this person obtained their authority to edit the tape.

8.     In addition, Plaintiff will also determine the identity of the officer who directed the Plaintiff to the area where he was unlawfully arrested as well as further

details regarding the meetings between the NYPD, the Mayor's Office, the Federal

Government and the Republican National Committee in which the plan to use unlawful

arrest policies and practices were created.


KURLAND, BONICA & ASSOCIATES, P.C.
f/k/a KURLAND & ASSOCIATES, P.C.
Attorney for Plaintiff


By: *Gina M. Bonica*

Gina M. Bonica, Esq. (GB-6615)
304 Park Avenue South, Suite 206
New York, NY 10010
(212) 253-6911(ph)
(212) 614-2532 (fax)

EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/18/06

-------------------------------------------------------------------- x

ALEXANDER DUNLOP,

                                          Plaintiff,

                    -versus-                                    06 CV 433 (KMK)(JCF)

THE CITY OF NEW YORK, et al.

                                          Defendants.

-------------------------------------------------------------------- x

All parties having consented to adjourn the following matters, it is herby **ORDERED**:

1.    Plaintiff shall file his amended complaint by January 15, 2007.  No further amendment to the complaint shall be permitted without leave of the court.

2.    The parties shall appear in Court at 12 pm on  February 2, 2007 for a pre-motion conference to address defendants' proposed motions to dismiss; defendants are not required to file any additional pre-motion papers on these issues;

3.    Defendants' time to answer shall be extended until 30 days after the later of the February 2, 2007 conference or the Court's order on defendants' proposed motions to dismiss;

4.    Discovery in this action is stayed until the later of the February 2, 2007 conference or the Court's order on defendants' proposed motions to dismiss.

                              SO ORDERED:

                              KENNETH M. KARAS
                              UNITED STATES DISTRICT JUDGE

                              Dated: December 15 , 2006

# *EXHIBIT "F"*



# COPY OF TRANSCRIPT

50-H HEARING

- - - - - - - - - - - - - - - - - - - - - - - -x

In the Matter of the Claim of

ALEXANDER DUNLOP

      -against-

THE CITY OF NEW YORK, THE NEW YORK CITY POLICE
DEPARTMENT, THE NEW YORK CITY DEPARTMENT OF
CORRECTIONS

- - - - - - - - - - - - - - - - - - - - - - - -x

BLA2004PI025478

                    61 Broadway
                    New York, New York

                    April 5, 2005
                    2:35 p.m.

      **EXAMINATION** of **ALEXANDER DUNLOP**, held

at the above time and place, taken before

Christine A. Traina, a shorthand reporter and

Notary Public within and for the State of

New York.



# REPORTING SERVICE, INC.
Professional Reporting Since 1980

1

2

A p p e a r a n c e s:

3

4      MICHAEL T. CONROY, ESQ.
           Attorney for Claimant
5          116 John Street, Suite 2201
           New York, New York  10038
6      BY:  MICHAEL CONROY, ESQ.

7

8

9      JANE N. BARRETT AND ASSOCIATES, LLC
           Attorneys for Respondent
10         61 Broadway, Suite 1050
           New York, New York  10006
11     BY:  CASEY MCARDLE, ESQ.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dunlop                                        29

1  They built chain-link-fences.  When they

2  eventually led us through all the tables and

3  metal detectors to get there, the paint was

4  brand new on the facility that they had built,

5  so they clearly just built them, but it was a

6  large open room like an airport hanger.  I

7  mean the floor was dirty, it was oily and

8  grimy and I mean it looked like an industrial

9  area.

10          Q     Do you know where it was located?

11          A     I don't.  We were inside the van

12  and then when we were led out of the van we

13  were already inside the facility so I don't

14  know exactly where it was located.

15          Q     How long were you at that

16  location?

17          A     Until about 7:00 a.m. the next

18  day, 7:00, 7:30.  It's hard to say because I

19  didn't have a watch, but it was morning.

20          Q     How many hours were you held in

21  total in connection with this arrest?

22          A     In connection with this I was

23  released eventually, it was between 6:00 and

24  7:00 p.m. on Saturday, the next day.  I would

```
 1                    Dunlop                    30

 2       say probably about 6:30, so just slightly less

 3       than 24 hours I guess all together.

 4            Q       Were you harassed or assaulted by

 5       anyone at the pier?

 6            A       Well harassed, yes.  Not

 7       assaulted.

 8            Q       How were you harassed?

 9            A       It was a lot of verbal harassment.

10            Q       By whom?

11            A       Various police officers.

12            Q       Can you describe it?

13            A       In one instance I asked the

14       officer to explain to me what was happening,

15       still again totally shocked and in shock that

16       I was arrested, A and that B, this was

17       happening, that I was going to miss my flight.

18       I couldn't contact my friends, I was asking

19       him what was going on, why is happening here.

20       He said to me, you have the right to shut the

21       fuck up.  He said you have to right to shut

22       the fuck up, I suggest you exercise that

23       right.  That was his response.

24            Q       Do you know that officer's name?

25            A       Nope, he was one of the booking
```